**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

ROYAL SMIT TRANSFORMERS                         CIVIL ACTION
BV ET AL.

VERSUS                                                  No. 16-14647

HC BEA-LUNA M/V ET AL.                              SECTION I

## ORDER AND REASONS

Before the Court are two motions[1] for summary judgment and a motion[2] to dismiss filed by the defendants. The motions for summary judgment are substantively identical. The motion to dismiss was filed by Onego Shipping & Chartering BV. It seeks dismissal for improper venue and only becomes relevant if the motions for summary judgment are denied. Because the Court grants summary judgment, the Court does not address the venue issue.

## I.

In November 2015, Royal SMIT Transformers BV ("Royal") agreed to sell three electrical transformers to non-party Entergy Louisiana, LLC. The transformers were manufactured in the Netherlands. Pursuant to its agreement with Entergy, Royal was to deliver and install the transformers at an Entergy facility located in St. Gabriel, Louisiana. To accomplish this, Royal contracted with Central Oceans USA, LLC ("Central Oceans"), a common carrier. Central Oceans was to transport the

---

[1] R. Doc. Nos. 38, 40.
[2] R. Doc. No. 39.

transformers from Rotterdam, the Netherlands, to the Entergy facility in Louisiana by any method of Central Oceans' choosing.

To fulfill its contractual obligations to Royal, Central Oceans entered into separate contracts with three actual carriers. Central Oceans hired Onego Shipping & Chartering BV ("Onego Shipping") to provide ocean carriage for the transformers from Rotterdam to New Orleans. Central Oceans hired Illinois Central Railroad Company ("Illinois Central") to transport the transformers by rail to St. Gabriel. And Central Oceans hired Berard Transportation, Inc. ("Berard") to offload the transformers from the trains and move them by truck to their final destination. Royal was not a party to any of these contracts.

Upon delivery in January 2016, an inspection of the transformers allegedly revealed that they had been damaged while in transit. Royal had obtained insurance coverage for the transformers, and the insurers were now obligated to pay Royal sums under the policies. By virtue of those payments, the insurance companies—AXA Versicherung AG, HDI-Gerling Industrie Versicherung AG, Basler Sachversicherung AG, and Ergo Versicherung AG—became subrogated to the rights of Royal, the insured. They filed this lawsuit against the common carrier and the three actual carriers seeking to recoup their losses.

This Court severed and transferred the claims against Central Oceans to the U.S. District Court for the Western District of Virginia pursuant to a mandatory forum selection clause in its contract with Royal. Only the claims against the actual carriers remain in this Court. Those defendants now move for summary judgment on the ground that they are not in privity of contract with Royal and that Royal's

contract with Central Oceans forbids Royal from asserting claims against the actual carriers hired by Central Oceans to transport the cargo.

## II.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id*.; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine dispute is not satisfied by creating "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine dispute of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment

may not rest upon the pleadings, but must identify specific facts that establish a genuine dispute. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

### III.

A bill of lading is a legal document which "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18-19 (2004). The bill of lading also serves as a receipt of shipment when the goods are delivered at the predetermined destination.

When shipping cargo internationally, it is common for cargo owners to make use of what are termed "through" bills of lading. A through bill of lading is a contract in which cargo owners arrange for transportation across oceans and to inland destinations in a single transaction. *Kirby*, 543 U.S. at 26. The advantage of through bills of lading is obvious: instead of locating several carriers and negotiating a separate contract for each leg of the journey, cargo owners can simply enter into a single transaction with a common carrier which will arrange to have the cargo owner's goods delivered from start to finish.

Everyone agrees that the contract entered into between Royal and Central Oceans is a through bill of lading. *See* R. Doc. No. 44-1, at 3 ("It is admitted that the Central Oceans Multimodal Transport Bill of Lading No. USA/RTD/NOLA2076 is a through multimodal bill of lading providing for the transport of the shipment in question from Rotterdam, The Netherlands to St. Gabriel, Louisiana."). The parties

also agree that the interpretation and effect of the through bill of lading is determined by federal maritime law. *See Kirby*, 543 U.S. at 27 ("Conceptually, so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage.").

Under admiralty law, a contract "should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Holmes Motors, Inc. v. BP Expl. & Prod., Inc.*, 829 F.3d 313, 315 (5th Cir. 2016) (internal quotation marks omitted). The provision at issue in the through bill of lading is referred to as a "Himalaya Clause." The term is derived from an English case involving a steamship called *Himalaya*. *See Kirby*, 543 U.S. at 20 n.2. Generally, Himalaya Clauses—which are common—extend liability limitations benefitting the common carrier to others acting as agents of the common carrier in the performance of the contract.

The Himalaya Clause in the through bill of lading between Royal and Central Oceans provides as follows (note that Royal is the "Merchant" and Central Oceans is the "Multimodal Transport Operator" or "MTO"):

15. Defences and limits for the MTO, Servants, etc.

(a) The provisions of this Contract apply to all claims against the MTO relating to the performance of the Multimodal Transport Contract, whether the claim be founded in contract or in tort.

**(b) The Merchant undertakes that no claim shall be made against any servant, agent or other persons whose services the MTO has used in order to perform the Multimodal Transport Contract and if any claim should nevertheless be made, to indemnify the MTO against all consequences thereof.**

(c) **However, the provisions of this Contract apply whenever claims relating to the performance of the Multimodal Transport Contract are made against any servant, agent or other person whose services the MTO has used in order to perform the Multimodal Transport Contract, whether such claims are founded in contract or in tort.** In entering into this Contract, the MTO, to the extent of such provisions, does so not only on his own behalf but also as agent or trustee for such persons. The aggregate liability of the MTO and such persons shall not exceed the limits in Clause 12.

R. Doc. No. 38-3, at 3 (emphasis added).

Royal does not contest that Onego Shipping, Illinois Central, and Berard must be considered "servant[s], agent[s], or other persons whose services the MTO has used in order to perform the Multimodal Transport Contract." The plain language of the Himalaya Clause indicates an intent to extend the liability limitation broadly—to "any servant, agent or other persons" whose services contribute to performing the contract. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Kirby*, 543 U.S. at 31 (internal quotation marks omitted). As each of the actual carriers was hired in furtherance of Central Oceans' obligation to deliver the transformers from Rotterdam to St. Gabriel, each of the carriers clearly falls within the broad scope of the provision.

The question is whether the actual carriers of the cargo can rely on the Himalaya Clause in the contract between Royal and Central Oceans to bar Royal's claims against them even though the actual carriers are not in privity of contract with Royal. The answer is governed both by federal maritime law and by a federal statute known as the Carriage of Goods by Sea Act (COGSA).

COGSA applies to shipments from United States ports to ports of foreign countries, and vice versa. *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S.

89, 96 (2010). The purpose of COGSA is to facilitate efficient contracting in contracts for carriage by sea. *See Kirby*, 543 U.S. at 29. Although the plaintiffs also purport to bring their claims under the Carmack Amendment, which governs the terms of bills of lading issued by domestic rail carriers, as well as under COGSA, Carmack does not control here. *See Regal-Beloit*, 561 U.S. at 100 ("Instructed by the text, history, and purposes of Carmack, the Court now holds that the amendment does not apply to a shipment originating overseas under a single through bill of lading.").

COGSA imposes certain limitations on a shipper and carrier's authority to adjust liability in a bill of lading. *Regal-Beloit*, 561 U.S. at 96. Any limitations of liability in a through bill of lading which conflict with COGSA are not enforceable. *See* 46 U.S.C. § 30704. But the immunities and limitations of COGSA do not automatically extend to the actual carriers hired by the common carrier. *See Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 301-05 (1959). In order to determine whether the protections and limitations allowed under COGSA should extend to the actual carriers, courts must look to the language of the contract between the cargo owner and the common carrier. *See Kirby*, 543 U.S. at 30 ("The question presented is whether the liability limitation in Kirby's and ICC's contract extends to Norfolk, which is ICC's sub-subcontractor. . . . This is a simple question of contract interpretation.").

Prior to 2004, there was a circuit split on whether privity of contract was required in order to extend a liability limitation to an actual carrier. In 2004, the Supreme Court settled the dispute by holding that privity of contract is not necessary to limit liability. The Court decided in *Kirby* that "a single Himalaya Clause can

cover both sea and land carriers downstream" as long as the through bill of lading provides for such downstream coverage. *See Kirby*, 543 U.S. at 29. The *Kirby* case confronted a factual scenario closely analogous to that before this Court: a foreign cargo owner hired a common carrier to transport goods from Australia to Alabama, the common carrier hired a shipping company, and the shipping company in turn hired a rail company. When the cargo was damaged during the rail portion of the journey, the cargo owner sued the rail carrier for damages under COGSA.

The Supreme Court ruled that although the rail company was not in privity of contract with the cargo owner or the common carrier, the through bill of lading's expansively-worded Himalaya clause extended the liability limitations all the way to the rail company. *Id.* at 31-32. Further, the Court recognized that the rail carrier could also take shelter in liability limitations in the contract between the common carrier and the shipping company by virtue of a Himalaya Clause in that contract. *Id.* at 32-36. In so holding, *Kirby* created a default rule that actual carriers who fall within the scope of Himalaya Clauses can rely on those clauses to limit their liability. The Supreme Court reaffirmed that principle several years later in *Regal-Beloit*. *See Regal-Beloit*, 561 U.S. at 109 ("The sophisticated cargo owners here agreed to maritime bills of lading that applied to the inland segment through the Himalaya Clause and authorized 'K' Line to subcontract for that inland segment 'on any terms whatsoever.' . . . The through bills provided the liability and venue rules for the foreseeable event that the cargo was damaged during carriage.").

While the Himalaya Clauses in *Kirby* and *Regal-Beloit* only limited the monetary liability of the actual carriers without denying the cargo owners the right

to sue them, courts have subsequently held that "COGSA permit[s] a carrier to accept exclusive liability for the negligence of its subcontractors." *Fed. Ins. Co. v. Union Pac. R. Co.*, 651 F.3d 1175, 1180 (9th Cir. 2011). It is now common practice to enforce Himalaya Clauses that deny cargo owners the right to sue the common carrier's servants or agents. *See, e.g.*, *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 180 (2d Cir. 2014) ("Accordingly, we conclude that the Exoneration Clause in the Yang Ming bill of lading unambiguously prevents the Railroads from being held liable to Sompo."); *Nipponkoa Ins. Co. v. Norfolk S. Ry. Co.*, 794 F. Supp. 2d 838, 844 (S.D. Ohio 2011) ("In sum, Nipponkoa has not shown any legal basis for invalidating the covenant not to sue, which unambiguously provides that Nipponkoa's insured may undertake 'no claim' against any of MOL's subcontractors, which includes Norfolk Southern."). The parties have not provided any Fifth Circuit case law to the contrary.

In sum, because Onego Shipping, Illinois Central, and Berard fall within the scope of the Himalaya Clause's protection, Royal cannot assert any claims against them.

## IV.

Royal advances only two arguments against the enforceability of the Himalaya Clause, neither of which can be sustained.

## A.

Royal first argues that "there are significant disputed issues of material fact concerning whether the [through bill of lading between Royal and Central Oceans] was the exclusive governing contract of carriage for the shipment in question." *See*

R. Doc. No. 44, at 7. Royal argues that the through bill of lading was only one of several contracts entered into between Royal and Central Oceans, and that its terms conflict to some degree with previous contracts. Royal's position cannot be sustained.

Regardless of any previous or conflicting contracts between Royal and Central Oceans, it is undisputed that only one through bill of lading was issued. In both *Kirby* and *Regal-Beloit*, the Supreme Court made clear that actual carriers are entitled to rely on liability limitations extended to them in through bills of lading. The Supreme Court in *Kirby* specifically rejected the argument that traditional agency law principles should determine which liability limitations an actual carrier should be permitted to rely on. *See Kirby*, 543 U.S. at 34. Although the Court crafted that rule in the context of deciding whether an actual carrier could take advantage of a Himalaya Clause negotiated between the common carrier and another actual carrier higher up the contract chain, the reasoning is equally applicable to contracts between the cargo owner and common carrier.

A rule prompting actual carriers to inquire whether the cargo owner and common carrier entered into any other agreements apart from the through bill of lading before relying on the through bill might be "very costly or even impossible" in practice. *See id.* at 35. Further, if actual carriers were required to gather such information, there is a real possibility that they would charge higher rates for transporting cargo. *See id.* Considering that the goal of COGSA is to facilitate efficient contracting in contracts for carriage by sea, *see id.* at 29, the creation of such a rule would run contrary to the purpose of COGSA generally as well as undermine COGSA's limited liability regime, *see id.* at 35.

10

In short, if any of the provisions in the through bill of lading are at odds with previous contracts entered into between Royal and Central Oceans, the liability of Central Oceans might be altered, but the liability of actual carriers which were not parties to those previous contracts cannot be affected. That dispute is between the cargo owner and the common carrier, not between the cargo owner and the actual carriers. Royal's first argument for refusing to enforce the Himalaya Clause is rejected.[3]

### B.

Royal next argues that the Himalaya Clause's enforceability may be affected by other "shipping documents" which were issued by the actual carriers to the common carrier. *See* R. Doc. No. 44, at 2. This argument is also rejected.

In *Kirby*, the Supreme Court permitted the rail carrier to take advantage of the Himalaya Clause in the through bill of lading notwithstanding the fact that at least one other bill of lading had subsequently been issued by the common carrier. *See Kirby*, 543 U.S. at 30-36. In reaching its decision, the Court did not consider the

---

[3] The Court notes admissions made by Royal which arguably conflict with its present position. Royal's verified complaint states that "On or about December 5, 2015, Royal SMIT contracted with Central Oceans wherein Central Oceans agreed to transport and carry the cargo from Rotterdam, Netherlands, to St. Gabriel, Louisiana, *pursuant to Multimodal Transport Bill of Lading No. USA/RTD/NOLA2076*." *See* R. Doc. No. 1, at 4 ¶ 14 (emphasis added). Royal also did not dispute the validity of the through bill in prior briefing to the Court. *See* R. Doc. No. 10, at 2 ("Specifically, the transformers were delivered by Royal Smit to defendant Central Oceans in good order and condition in the Port of Rotterdam for carriage and delivery by Central Oceans to an Entergy substation located in St. Gabriel, Louisiana, *all pursuant to Central Ocean's Multimodal Transport Bill of Lading* dated December 5, 2015." (emphasis added)). The Court relied on the validity of the through bill when it transferred the claims against Central Oceans to Virginia. *See* R. Doc. No. 31.

effect of any contracts entered into between the rail carrier and the ocean liner which hired the rail carrier. *See Mitsui Sumitomo Ins. Co. v. Evergreen Marine Corp.*, 621 F.3d 215, 219 (2d Cir. 2010) ("The Supreme Court did not describe the documents that governed [the rail carrier's] carriage of the cargo at issue in *Regal–Beloit*. However, this is a distinction without a difference.").

The reason is because the terms of subsequent shipping documents do not affect the actual carrier's ability to limit its liability by virtue of the through bill's Himalaya Clause. *See Golden Logistics, S.A. de C.V. v. Danny Herman Trucking, Inc.*, 2011 WL 3567521, at *3 (S.D. Tex. Aug. 12, 2011) ("Once a through bill of lading has been issued to the carrier who initially receives a load for shipment, the character of the shipment is not affected by connecting carriers' bills of lading that serve merely as receipts."). The cases cited by Royal do not provide otherwise, as Royal mentions only cases in which through bills of lading were not at issue. *See LIG Ins. Co. v. ZP Transp. Inc.*, No. 14 CV 4007, 2015 WL 4725004, at *4 (N.D. Ill. July 31, 2015) ("The cases cited by ZP Transport are distinguishable because the facts of those cases involved 'through' bills of lading."). Because Royal admits that its contract with Central Oceans is a through bill lading, any subsequent documents issued by the actual carriers in this case do not affect the enforceability of the Himalaya Clause in the through bill.

## V.

Under the Supreme Court's decision in *Kirby*, the Himalaya Clause in the through bill of lading between Royal and Central Oceans is enforceable by the defendants. Royal cannot sue Onego Shipping, Illinois Central, or Berard for the

damage to the transformers. But this does not leave Royal without a remedy. Royal and its insurers may pursue claims against Central Oceans in the Virginia court. If Royal is successful, it will be for Central Oceans to attempt to seek indemnification from the actual carrier responsible for the damage. *See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 891 F. Supp. 2d 489, 502 (S.D.N.Y. 2012). As such,

IT IS ORDERED that the motions for summary judgment are **GRANTED** and that all of plaintiffs' claims against Illinois Central, Onego Shipping, and Berard are **DISMISSED WITH PREJUDICE**.

IT IS FURTHER ORDERED that the motion to dismiss filed by Onego Shipping is **DISMISSED** as moot.

New Orleans, Louisiana, May 31, 2017.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**